**WARSHAW LAW FIRM, LLC**
Julie Warshaw, Esq. (ID#027931993)
266 King George Road, Suite I
Warren, New Jersey 07059
Phone: (973) 433-2121
Fax: (973) 439-1047
jwarshaw@warshawlawfirm.com
Attorneys for Plaintiff

| | |
|---|---|
| **JENNIFER VITELLA AND** : <br> **JOSEPH ATTILIO,** : <br> Plaintiffs : <br> : <br> **RUTGERS, THE STATE UNIVER-**: <br> **SITY OF NEW JERSEY, THE** : <br> **BOARD OF GOVERNORS,** IN : <br> THEIR OFFICIAL CAPACITIES, : <br> **THE BOARD OF TRUSTEES,** IN : <br> THEIR OFFICIAL CAPACITIES, : <br> **ROBERT BARCHI,** INDIVIDUAL-: <br> LY AND AS PRESIDENT OF RUT- : <br> GERS THE STATE UNIVERSITY, : <br> **EUGENE MURPHY,** INDIVID- : <br> UALLY AND IN HIS OFFICIAL : <br> CAPACITY AS ASSOCIATE : <br> VICE PRESIDENT FOR : <br> INTERNATIONAL & GLOBAL : <br> AFFIARS, **DR. LAURA GATZ-** : <br> **KIEWICZ,** INDIVIDUALLY AND : <br> IN HER OFFICIAL CAPACITY AS : <br> RESIDENT DIRECTOR, : <br> RUTGERS IN SPAIN : <br> **LAUREN WINOGRON,** INDIV- : <br> IDUALLY AND IN HER OFFICIAL: <br> CAPACITY AS SENIOR : <br> PROGRM COORDINATOR, : <br> **DONALD HEILMAN** : <br> INDIVIDUALLY AND IN HIS : <br> OFFICIAL CAPACITY AS : <br> DIRECTOR OF STUDENT : | UNITED STATES DISTRICT COURT <br> DISTRICT OF NEW JERSEY <br> <br> CASE NO.: <br> **CIVIL ACTION** <br> <br> <br> **COMPLAINT** |

LEGAL SERVICES                    :
**JOHN DOES 1-100**               :
      Defendants                  :
_____  :

      Plaintiffs, Jennifer Vitella and Joseph Attilio, by way of Complaint do hereby state:

## **PARTIES**

1.     Plaintiff, Jennifer Vitella, (hereinafter "Plaintiff") was at all times relevant hereto a student at the Rutgers School of Arts & Sciences and a resident of 1854 Arena Drive, Hamilton 08610 in the State of New Jersey.  Plaintiff began as an undergraduate student at the Rutgers School of Arts & Sciences in September 2016 with two (2) declared majors, one (1) of which was Spanish.

2.     Joseph Attilio is Plaintiff's husband.

3.     Under the Doctrine of *Respondeat Superior*, said Defendants are liable for the acts of its officials, agents, servants, employees, representatives and/or appointees.  Said individual Defendants are each being sued in their individual and official capacities.  Said Defendants' primary place of business is 83 Somerset Street, New Brunswick, New Jersey.

4.     At all relevant times, the Board of Trustees, Rutgers, The State University of New Jersey and the Board of Governors, under the Doctrine of *Respondeat Superior*, said Defendants, are liable for the acts of its officials, agents, servants, employees, representatives and/or appointees.  Said Defendants are each being

sued in their official capacities. Said Defendants' make decisions as to the status of students and programs. Their primary place of business is 83 Somerset Street, New Brunswick, New Jersey.

5.      At all relevant times, Robert Barchi, President of Rutgers, The State University of New Jersey, under the Doctrine of *Respondeat Superior*, said Defendant, is liable for the acts of its officials, agents, servants, employees, representatives and/or appointees. Said Defendant is being sued in his individual and official capacity. Said Defendant's primary place of business is Winants Hall, 7 College Avenue, 2nd Floor, New Brunswick, NJ 08901.

6.      At all relevant times, Defendant Eugene Murphy, individually and in his official capacity as the Assistant Vice President for International and Global Affairs, under the Doctrine of *Respondeat Superior*, said Defendant, is liable for the acts of its officials, agents, servants, employees, representatives and/or appointees. Said Defendant is being sued in his individual and official capacity. Said Defendant's primary place of business is located at 30 College Ave., New Brunswick, New Jersey 08901.

7.      At all relevant times, Defendant Dr. Laura Gatzkiewicz, individually and in her official capacity as the Resident Director of Rutgers in Spain, discriminated against Plaintiff and violated her rights. Said Defendant's primary place of

business is located at C/Guillem de Castro, 53-12, 46007 Valencia, Spain, but she is also a faculty member of Rutgers, The State University of New Jersey.

8.     At all relevant times, Defendant, Lauren Winogron, individually and in her official capacity as the Senior Program Coordinator, has violated Plaintiff's legal rights and discriminated against Plaintiff. Said Defendant's primary place of business is located at 102 College Ave., New Brunswick, New Jersey 08901.

9.     At all relevant times, Donald Heilman, individually and in his official capacity as the Director of Student Legal Services, has violated Plaintiff's legal rights and discriminated against Plaintiff. Said Defendant's primary place of business is located at Tillett Hall, Room 247; 53 Avenue E Piscataway, New Jersey 08854.

10.    Pursuant to the Doctrine of Respondeat Superior, all said Defendants are liable for the acts of its officials, agents, servants, employees, representatives and/or appointees.

11.    At all relevant times, John Doe 1 was a fellow undergraduate student in the same program as Plaintiff. Said Defendant's place of business is unknown at this time. He/she was allegedly involved with making false complaints against Plaintiff.

12.    At all relevant times, Defendants John Does 2-100 are unknown at this time but are believed to be individually and in their official capacities to have violated Plaintiff's legal rights and discriminated against Plaintiff.

## JURISDICTION AND VENUE

1. Jurisdiction is proper under 28 U.S.C. §1331, because Rutgers, The State University of New Jersey is located within Middlesex County, New Jersey.

2. Venue is proper pursuant to R. 4:3-2(a) because it lies where the cause of action arose. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. Section 1331, based on federal questions and issues in this case arising under Federal Law and other applicable provisions of Federal Law, the U.S. Constitution, as well as State Law.

3. Venue is properly fixed in this Court under 28 U.S.C. Section 1391 and other applicable provisions of Federal Law as all parties reside or are located in and all known violations of Federal and State Law and the U.S. Constitution took place in New Jersey and the amount in controversy exceeds the required amount for purposes of establishing jurisdiction in Federal Court.

4. The issues in this matter are ripe for consideration by this Court because J.V. has been and continues to be discriminated against due to her disability, she has been denied equal access to educational services and her rights under Federal and State

5

laws have been violated. Plaintiff reserves her right to bring forth other claims against defendants upon discovery of such.

## FACTS COMMON TO ALL COUNTS

1. Plaintiff applied for and was accepted to participated in a six (6) month study abroad program in the Kingdom of Spain offered by Defendant Rutgers, The State University of New Jersey (hereinafter "Rutgers").

2. Plaintiff paid Defendant Rutgers a tuition of $26,000 to participate in the study abroad program.

3. Prior to the study abroad program Plaintiff was diagnosed with several physical and psychological conditions, including but not limited to bipolar disorder, and Plaintiff was taking prescription medication to control her conditions.

4. Plaintiff's bipolar condition qualified her for a §504 plan under the Rehabilitation Act of 1973. See 29 U.S.C. §701, et seq.

5. Defendants were aware of Plaintiff's physical and psychological disabilities and aware of Plaintiff's special needs as a result of her disabilities and as such, issued Plaintiff a 504 Plan, which included accommodations and services and it was in effect during the relevant timeframes.

6. On or about Nov. 22, 2017, prior to participating in the study abroad program Plaintiff was given a Letter of Accommodation from Brian Maher, Disability Services Coordinator for Rutgers University, which Plaintiff provided to her study

abroad professors, as well as Lauren Winogron, Senior Program Coordinator, and

Laura Gatzkiewicz, Resident Director of Rutgers in Spain.

7.  Plaintiff was also designated as a "Student Receiving Notes" by Bob Loder of the

Office of Disability Services, Rutgers.  This means that another student, or the

professor, was designated to take and download notes for Plaintiff as part of her

disability accommodation.

8.  For several months Plaintiff was in contact with Brian Maher, Disability Services

Coordinator, Lauren Winogron, Senior Program Coordinator, and Laura

Gatzkiewicz, Resident Director of Rutgers in Spain, to address Plaintiff's special

needs prior to the start of and during the study abroad program.

9.  By way of example, but not limited to, Plaintiff provided Defendants with a

complete list of her medical conditions and medications.

10. By way of further example, but not limited to, on or about December 21, 2017,

Laura Gatzkiewicz sent an email to Plaintiff advising her that she had consulted

with a pharmacist in the Kingdom of Spain and with the Spanish National Police

about Plaintiff's medications.  Ms. Gatzkiewicz told Plaintiff that according to the

local pharmacist "nearly all the medications on [your list] are available through a

normal pharmacy in Spain with a doctor's prescription."  She also advised Plaintiff

that if she chose to bring five (5) months of medication with her, then Plaintiff

would be stopped and questioned by the Spanish National Police, but may be

allowed to bring her medications into the Kingdom of Spain, if Plaintiff showed the Spanish National Police her Visa and all of her medical prescriptions and documentation. Ms. Gatzkiewicz did not identify which, if any, of Plaintiff's medications would not be allowed into the Kingdom of Spain or which would be unavailable in the Kingdom of Spain. Upon information and belief Ms. Gatzkiewicz did not consult with a doctor in the Kingdom of Spain regarding Plaintiff's medication.

11. Almost immediately upon arrival in the Kingdom of Spain, Plaintiff began voicing concerns to Ms. Gatzkiewicz about the accommodations and that she wanted to return to the United States. By way of example, but not without limitation, Plaintiff advised Ms. Gatzkiewicz that due to her physical condition, it would be difficult for her to do laundry and other necessary chores. Ms. Gatzkiewicz's advice was to "[g]ive it a few more days."

12. Plaintiff had trouble making an appointment with a doctor to obtain prescriptions for her medications because her insurance company was refusing to pay for the doctor's visits and the medication. Plaintiff voiced this concern to Dr. Maria J. Zarza and Laura Gatzkiewicz. Ms. Zarza advised Plaintiff, once she was already in the Kingdom of Spain, that she would need to see Dr. Jose Salazar at Bionexum Health Center to obtain prescriptions for her medications, but that her insurance provider would have to first provide a guarantee of payment to the clinic. Ms.

8

Gatzkiewicz advised Plaintiff to contact an organization known at International SOS for help. At this point Plaintiff needed prescriptions for Vyvanse, Methylphenidate and a Butrans patch. Plaintiff was advised by International SOS that she would have to pay for her doctor's appointments and prescriptions out-of-pocket while International SOS negotiated with the insurance company.

13. Plaintiff's cell phone did not have international calling and she had to coordinate her efforts with International SOS through email and enlist the help of Plaintiff's husband.

14. On or about January 8, 2018 Plaintiff was advised for the first time by International SOS that she would not be able to obtain prescriptions for Latuda in the Kingdom of Spain.

15. On or about January 14, 2018 Plaintiff contacted Laura Gatzkiewicz and advised her that there was an issue with the note-taking assistance that Plaintiff was approved to receive. Ms. Gatzkiewicz offered to give Plaintiff her notes but Ms. Gatzkiewicz cautioned Plaintiff that all the notes would be handwritten and not typed. Plaintiff was also advised that at least one (1) other student refused to share her notes with Plaintiff.

16. Plaintiff requested a "word bank" as a reasonable accommodation to assist her with her classroom work. She made this request to Brian Maher. Mr. Maher advised

that the decision to provide Plaintiff with a "word bank" was solely within the discretion of the professor. Plaintiff's request was denied by the professor.

17. On or about January 26, 2018 Plaintiff learned for the first time from International SOS that her prescription for Marinol from the United States could not be filled in the Kingdom of Spain, as that drug was neither commercially sold nor was it "legal" in the Kingdom of Spain.

18. On or about January 28, 2018 Plaintiff complained to Lauren Gatzkiewicz that the other students in the program were ostracizing her, either in part or in whole because of Plaintiff's age and physical and psychological disabilities. The other students refused to participate in group activities with Plaintiff and refused to allow Plaintiff to join them during meals and outings. These are the same students who were supposed to be providing Plaintiff with copies of their class notes as part of Plaintiff's disability accommodation. Plaintiff also voiced this complaint to Laura Gatzkiewicz through text messages on several occasions and Ms. Gatzkiewicz stated that she was helpless to resolve the issue. Ms. Gatzkiewicz's advice was for Plaintiff to see her social isolation as an adventure and use it as an opportunity to explore the Kingdom of Spain on her own. Ms. Gatzkiewicz also said on one (1) occasion that she could not have dinner with Plaintiff because it "was to [sic] political."

19. At the time that Plaintiff participated in the study abroad program, she was forty-two (42) years old.  Since Plaintiff was older than the other students in the program, she was often shunned and left out of social activities.

20. Plaintiff brought this fact to the attention of Laura Gatzkiewicz, and her advice to Plaintiff was to "take a warm bath or walk."

21. Plaintiff wrote a letter to Lauren Winogron complaining about her treatment in the program and about the discrimination against her due to her disabilities. She was very open about her disabilities before going on the study abroad program and while in Spain, she was not provided with the accommodations she was entitled to receive. She was left on her own to determine how to obtain medications and she was denied assistance with and accommodations and services for her disabilities.

22. Within two (2) days of Plaintiff writing her complaint letter, Plaintiff was told that the Dean wanted to speak to her.

23. Plaintiff was suddenly advised that another student in the program allegedly complained that Plaintiff offered her prescription medication and that Plaintiff was required to have a conference call with Associate Vice President Eugene Murphy.

24. Plaintiff asked the Office of the Ombudsman at Rutgers for legal assistance and she was referred to Donald Heilman.  Plaintiff attempted to contact Mr. Heilman several times by email about this situation, but never received a response.

25. Plaintiff denied the allegations made against her and several times requested a copy of the student's complaint, and each request was denied by Defendants.

26. Plaintiff was allegedly accused of offering the student Percoset, which was not a medication that she had, or was prescribed, or used for her medical or emotional issues. The allegations were false.

27. Just a few days after Plaintiff's complaint letter, on or about January 29, 2018, Plaintiff was informed by Associate Vice President Eugene Murphy that she was being terminated from the program immediately and that she would have to make arrangements to return to the United States at her own expense.

28. During the conference call Eugene Murphy stated that he spoke with Plaintiff's doctors in the Kingdom of Spain, without Plaintiff's knowledge or consent and without any HIPAA release, and that he decided to dismiss her from the program and that she would need to make arrangements, at her own expense, to return to the United States. The Dean apparently indicated that the reason she was being dismissed was because when he spoke to her doctors in Spain, they apparently indicated that her Lithium dosage had been lowered and he mentioned this alleged student complaint. There was no investigation into the allegations and no complaint was ever produced.

29. On or about February 1, 2018 Plaintiff's access to the building where she was living in the Kingdom of Spain was revoked by Climatización Ausias March.

30. Having been told that she was being dismissed from the program and was falsely accused, Plaintiff felt pressured and that she had no choice but to withdraw from the program for medical reasons.  She advised Ms. Gatzkiewicz of this decision, and that information in turn was communicated to Eugene Murphy.

31. Eugene Murphy immediately contacted Plaintiff and advised her that she needed to submit her request for medical leave right away and, if she did so, then he would not act upon the letter of dismissal.

32. On or about February 5, 2018 Plaintiff submitted a Leave of Absence Request that was granted by Defendants.

33. On or about February 5, 2018 Plaintiff emailed Donald Heilman about a complaint for discrimination form that Mr. Heilman was supposed to email to Plaintiff, but never did. She repeatedly reached out to him to determine her rights to appeal and she did not receive any response from him.

34. Upon returning to the United States Plaintiff had all of her medications refilled and then sent an email on February 9, 2018 to Eugene Murphy requesting that she be admitted back to the study abroad program and complete her studies in the Kingdom of Spain.  That request was denied.

35. While studying abroad in the Kingdom of Spain one of Plaintiff's medication became less effective and she was unable to get some medications as well.

Plaintiff's doctors in Spain recommended that she lower her Lithium dosage and her doctor in the United States agreed and the dosage was lowered.

36. By way of explanation for the decision to dismiss Plaintiff from the program, Mr. Murphy stated that he spoke with Plaintiff's two (2) doctors in Spain about her bipolar condition and that the doctors advised Mr. Murphy that they had lowered Plaintiff's Lithium dosage.

37. Any conversation between Eugene Murphy and Plaintiff's two (2) doctors in Spain were without her knowledge and consent and in violation of the HIPAA laws.

38. Mr. Murphy also stated that Plaintiff was being dismissed from the program because another student alleged that Plaintiff had offered to give him/her Percoset.

39. Plaintiff requested information about the student who lodged this complaint and a copy of same, and Eugene Murphy refused to provide Plaintiff with any information.

40. Percoset is not a medication that Plaintiff was taking to control her bipolar condition or for any of her other medical issues.  Plaintiff did not have possession of Percoset at any time on her trip to Spain.

41. When Plaintiff returned to the United States, she received a bill from Rutgers University for reimbursement for her financial aid in the approximate amount of $13,000. Not only was Plaintiff removed from her study abroad program due to her disabilities and in retaliation for complaining about the program, but she was then

14

unable to continue her studies at Rutgers as an undergraduate because she would

not be admitted back into the University without first paying the outstanding

financial aid amount.

42. When Eugene Murphy dismissed her from the program, Plaintiff immediately

requested information about how to go about filing an appeal. Eugene Murphy

denied her that right.

43. Plaintiff's counsel sent a letter dated July 22, 2018 to Barbara Turen, Esq., attorney

for Rutgers indicating that Plaintiff's 504 Plan was violated.  On July 23, 2018,

Ms. Turen indicated that she was sending it to "the OGC disputes for further

action."

44. To date, there has been no response or resolution to these issues. Plaintiff remains

out of school and unable to complete her undergraduate degree.

45. Since being dismissed from her study abroad program, Plaintiff was never afforded

any hearing, informal or formal, she was denied a copy of the complaint against

her by the alleged student, she was denied access to her classes and denied the

ability to complete her degrees.

46. Since being dismissed from her study abroad program, Plaintiff has suffered from

Post-Traumatic Stress Disorder, significant anxiety, and a worsening of her

physical and psychological conditions, related to this dismissal. Plaintiff was

denied her rights without any due process and is now unable to complete her

degrees or go back to her study abroad program. She has incurred significant costs and medical expenses related to her conditions and her inability to obtain her degrees has damaged her ability to obtain employment.

47. On October 11, 2018, Dr. Kani Ilangovan confirmed that she has been under psychiatric care from February 22, 2018 through present, and that she was/is suffering from symptoms of Post-Traumatic Stress Disorder due to being expelled from her program in Spain.  According to Dr. Ilangovan, Plaintiff is too distraught to seek help or make a legal decision in her best interest.

48. Plaintiff continues to suffer damages as a direct and proximate result of the deliberate, intentional, discriminatory actions and inactions of defendants in this matter.

49. Plaintiffs have filed a motion to allow them to file a late notice of tort claim.

## COUNT ONE

### (29 U.S.C. §701, et seq., THE REHABILITATION ACT OF 1973)

50. Plaintiffs repeat, re-allege, and incorporate each and every allegation and claim set forth above with the same force and effect as though fully set forth herein.

51. Under Section 504, no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.  29 U.S.C. § 794.

16

52. To establish a violation of Section 504, a plaintiff must show that: (a) s/he is an individual with a disability; (b) s/he is otherwise qualified for participation in the program; (c) the program the plaintiff is challenging receives federal financial assistance; and (d) s/he was subjected to discrimination under the program solely on account of his/her disability. Nathanson v. Med. College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir.1991).

53. J.V. meets the criteria to establish a violation of Section 504 of the Rehabilitation Act. J.V. is disabled because she has a diagnosis of several physical and psychological disabilities. Due to her disabilities, she has a substantial limitation on major life activities of learning. She is otherwise qualified to participate in school activities as she did all her life in school and in college. She is otherwise qualified to participate in Defendant University's educational and study abroad programs. She was issued a Section 504 Plan by the Defendants, which they violated by not providing the necessary accommodations and services to her while on the study abroad program. As soon as she made a complaint to that effect, she was terminated from the program due to her disabilities.

54. Rutgers University is a public facility and school that receives federal funding and assistance from the United States Department of Education and the New Jersey Department of Education.

55. J.V. was excluded from the participation in, denied the benefits of, and subjected to discrimination by the University and a University program by University employees both in the United States and in Spain.

56. The University knew before Plaintiff was accepted to and went on the study abroad program that she was a student with disabilities yet, discriminated against her by choosing to dismiss her from the study abroad program due to her disability and the manifestations therefrom.

57. Her disability was used as a means of discrimination and as a result, she was removed from the study abroad program and is being prevented from returning to her undergraduate program at the University due to the financial penalties lodged against her, thereby denying her access to education and to a public entity. Said financial penalties resulted directly from her being removed from the study abroad program.

58. As a result of Defendants' violations of his rights under Section 504, J.V. suffered and continues to suffer the loss of education, humiliation, shame, isolation, anxiety, emotional distress, Post-Traumatic Stress Disorder, economic losses, and aggravation of her disability entitling her to compensatory damages in an amount to be determined at trial.

## COUNT TWO

**(Violation of Americans With Disabilities Act and the Americans With Disabilities Amendment Act)**

59. Plaintiffs repeat, reallege, and incorporate each and every allegation set forth above with the same force and effect as if such allegations are set forth at length herein.

60. Under Title II of the ADA, no "qualified individual with a disability" shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

61. The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2).

62. To establish a violation under Title II of the ADA, a plaintiff must show the same elements as under Section 504, except plaintiff need not show that a defendant is a recipient of federal financial assistance, but rather that the defendant is a "public entity." A.H. ex rel. M.H. v. New Jersey Dept. of Educ., Slip Copy, 2006 WL 3359644, *4 (D.N.J. 2006).

63. Defendant Rutgers and its staff, employees, administration, and each individually named defendant have by their actions and inactions, violated J.V.'s rights under Title II of the ADA as she is a qualified individual with a disability under the ADA, Defendant Rutgers is a public entity, and J.V. was excluded from the

participation in, denied the benefits of, and subjected to discrimination in the

Defendant Rutgers' education program and study abroad program, solely on

account of her disability. J.V. was denied access to a public entity, school, based

on her disability and the manifestations therefrom.

64. As a result of Defendants' violations of his rights under Title II of the ADA, J.V.

suffered and continues to suffer the loss of education, humiliation, shame,

isolation, anxiety, Post-Traumatic Stress Disorder, emotional distress, economic

losses, and aggravation of her disability entitling her to compensatory damages in

an amount to be determined at trial.

## COUNT THREE

**(Violation of the New Jersey Civil Rights Act, hereinafter "NJCRA" and (42 U.S.C. §1983, et seq., THE CIVIL RIGHTS ACT OF 1964)**

65. Plaintiffs repeat, reallege, and incorporate each and every allegation set forth above

with the same force and effect as if such allegations are set forth at length herein.

66. Pursuant to N.J.S.A. 10: 6-2 (c) and (d), "Any person who has been deprived of

any substantive due process or equal protection rights, privileges or immunities

secured by the …Constitution or laws of this State, or whose exercise or enjoyment

of those substantive rights, privileges or immunities have been interfered with or

attempted to be interfered with, by threats, intimidation or coercion by a person

acting under color of law, may bring a civil action for damages."

67. Pursuant to <u>N.J.S.A.</u> 10:1-2, "Equal rights and privileges of all persons in public places; All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodation, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons."

68. 42 U.S.C. 1983 states in part, "Every person who…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

69. All individual defendants set forth herein meet the definition of "person."

70. J.V. was denied access to Rutgers' study abroad program and to the University itself due to her disability in violation of her 504 Plan and without any type of hearing, informal or formal and without an appeal.

71. Individually named Defendants such as the Dean and the Rutgers' professors in Spain, had the responsibility to oversee students with disabilities in the University and in University programs to ensure that their educational programs and services met their individual needs.  As a result of their failures, J.V. was denied equal protection for failure to provide J.V. with notice and a hearing before being

excluded from school, thereby denying J.V. her Constitutional right to access to public education.

72. A public University meets the definition of a public place and J.V. is entitled to equal accommodation to said public place. The Dean made a decision to retaliate against J.V. for her complaint about the program and to allege false allegations against J.V. to try to justify his actions and discrimination. The Dean also allegedly violated J.V.'s rights under the HIPAA laws because he claimed he spoke to both of her doctors in Spain, when he did not and did not have any consent to do so. He did gain access to her personal medical information without her consent or knowledge. He denied J.V. the right to an education due to her disabilities.

73. Plaintiff was deprived of her right to Due Process under the 14th Amendment, as she was not afforded notice, or an opportunity for a hearing, or an appeal, prior to being excluded from the University.

74. J.V. was deprived of her rights under the Equal Protection Clause of the Constitution because she was treated differently due to her disabilities and the manifestations thereof and denied equal access to education and protection under the law.

75. In violation of the New Jersey Civil Rights Act, J.V. 's fundamental right to be free from tyranny was violated by defendants.

76. Defendants, acting under color of law, have interfered with J.V.'s substantive due process rights, privileges or immunities secured by the Constitution and/or the laws of the United States and Constitution and/or laws of the State of New Jersey.

77. Thus, J.V. has been denied equal rights and privileges of all persons in public places by Rutgers and all of the named individual defendants in violation of New Jersey Civil Rights Act and the Civil Rights Act of 1964.

## COUNT FOUR

**DEFENDANTS VIOLATED 42 U.S.C. §300gg, et seq.; 29 U.S.C. §1181, et seq,; 42 U.S.C. §1320d, THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT**

78. Plaintiffs repeat, reallege, and incorporate each and every allegation set forth above with the same force and effect as if such allegations are set forth at length herein.

79. On or about January 29, 2018, Mr. Eugene Murphy indicated to Plaintiff via conference call that he had spoken to her doctors in Spain and they indicated that they had lowered her Lithium dosage.

80. Associate Vice President Murphy did not have any consent or authorization or signed HIPAA form by Plaintiff indicating that he had any right to speak to her medical providers or have access to her medical or treatment information.

81. This action was in violation of J.V.'s rights under the Health Insurance Portability and Accountability Act.

82. As a result, J.V. has suffered damages.

## COUNT FIVE
### (BREACH OF CONTRACT)

83.     Plaintiffs repeat, re-allege, and incorporate each and every allegation and

fact set forth above with the same force and effect as though they were fully set

forth at length herein.

84.     Defendants, through their own conduct, actions and inactions, individually

and in their official capacities breached their tuition contract with Plaintiff.

85.     Plaintiffs paid tuition and also had applied for and received financial aid for

the 2018-2019 school year.

86.     As a result of the actions and inactions by the Defendants, J.V. was billed

more than $13,000 that she has to pay back to the University before she can be

allowed back to her undergraduate program. Even if this amount was paid, there is

also no guarantee that she will be allowed back to her undergraduate program.

87.     This is impossible for her to pay back and she would not have had to pay

this money back but for the actions and inactions of the Defendants in removing

her without cause from the study abroad program.

88.     Defendants have breached their own policies and procedures by their actions

and inactions, by their failures to comply with her Section 504 Plan, denying her

accommodations, denying her due process rights by terminating her from the study

abroad program and from the University, denying her the right to attend school

without giving her notice, a hearing, and/or an appeal, as well as Defendants committed other actions and inactions to be discovered during the course of discovery.

89.    Thus, Plaintiffs have suffered and continue to suffer damages while Defendants have been unjustly enriched. Defendant Rutgers has been paid its tuition and yet, terminated J.V. from the study abroad program. Now, J.V. will be burdened with repaying the financial aid paid to the University in order to be able to reenroll in the University. There is also no indication that if she is able to pay this sum, that the University will allow her back into the undergraduate program, as she was already informed that she will not be allowed back to the study abroad program.

90.    Despite the lack of due process and proof, J.V. was removed from the study abroad program without any due process, notice, hearing, or appeal and Rutgers benefited from said action.

91.    Plaintiffs demand that their tuition agreement be enforced.

## COUNT SIX

**(DEFENDANTS ARE LIABLE UNDER SECTION 1983 AND VIOLATED J.V.'S FIRST AMENDMENT RIGHTS AND HER RIGHT TO FREE SPEECH UNDER THE CONSTITUTION OF THE STATE OF NEW JERSEY)**

92.     Plaintiffs repeat, reallege, and incorporate each and every allegation and fact set forth above with the same force and effect as though they were fully set forth at length herein.

93.     Section 42 U.S.C. 1983 states in part, "Every person who…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Under the First Amendment, [A] school may categorically prohibit lewd, vulgar or profane language on school property." Saxe v. State Coll. Area Sch. Dist., 240 F. 3d 200, 2014 (3d Cir. 2001). [A] school may regulate school-sponsored speech…on the basis of any legitimate pedagogical concern." Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (S. Ct. 1988). "[S]peech failing outside of these categories is subject to *Tinker's* general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the rights of others." Layshock v. Hermitage School District, 496 F. Supp. 2d 587, 596 (2007).

94.     In the present case, J.V.'s complaint about the program did not cause any substantial disruption in school operations or interfere with the rights of others. Instead, she was concerned about her own treatment and the lack of accommodations for her for her disabilities. Her needs were not being met and she

was entitled to accommodations under her 504 Plan. No disruption of the school

operations was even mentioned by Defendants and the alleged claim by another

student was false, if it even existed, as Plaintiff was denied the right to see said

complaint. Thus, her speech was protected under the Tinker guidelines.

95.     Article 1, Paragraph 6 of the Constitution of the State of New Jersey

provides that: "Every person may freely speak, write and publish his sentiments on

all subjects, being responsible for the abuse of that right.  No law shall be passed to

restrain or abridge the liberty of speech or of the press."

96.     Here, Plaintiff was retaliated against in violation of her rights under Article

1, Paragraph 6 of the Constitution of the State of New Jersey and under the First

Amendment.

97.     To state a First Amendment retaliation claim, a Plaintiff must show "(1)

constitutionally protected conduct, (2) retaliatory action sufficient to deter a person

of ordinary firmness from exercising his constitutional rights, and (3) a causal link

between the constitutionally protected conduct and the retaliatory action." Islam v.

City of Bridgeton, 804 F. Supp. 2d 190, 198 (D.N.J. 2011); see also Zahl v. N.J.

Dep't of Law & Pub. Safety, 2010 U.S. Dist. LEXIS 22410, *17-18 (D.N.J. 2010).

98.     Here, when Plaintiff began having issues with her accommodations with

note taking and her ability to obtain her necessary medications, she complained to

the professor in Spain about the program and the lack of assistance she was getting.

She complained about how the other students were ostracizing her and nothing was being done about it. Instead, the answer was to take a bath or to take a walk alone. There was no assistance by the professor or anyone in the program to obtain class notes for her, as per her accommodations for her disabilities.

99.     Within a few days after Plaintiff's expression, the discriminatory actions and inactions by professor and Associate Vice President Murphy occurred and Plaintiff was removed from the program.

100.    As such, Defendants infringed upon Plaintiff's constitutional rights to free speech.

## COUNT SEVEN

## (NEW JERSEY LAW AGAINST DISCRIMINATION)

101.    Plaintiffs repeat, re-allege, and incorporate each and every allegation and fact set forth above with the same force and effect as though they were fully set forth at length herein.

102.    Plaintiff has documented disabilities and was provided with a 504 Plan containing accommodations for her disabilities. That document and accommodations should have been put into effect during her study abroad program as it was a Rutgers' program in Spain with Rutgers employees as professors. As such, Defendants were responsible for ensuring that these accommodations such as

note taking was put into place for Plaintiff. When Plaintiff complained that they were not being implemented, she was retaliated against.

103.   The New Jersey Law Against Discrimination ("NJLAD") states in part, "[a]ll persons shall have the opportunity to obtain … all the accommodations, advantages, facilities, and privileges of any place of public accommodation … without discrimination of …disability … This opportunity is recognized as and declared to be a civil right." See N.J.S.A. 10: 5-4.

104.   Under the NJLAD, N.J.S.A. 10:5-1, *et seq.*, public schools, such as Rutgers, are prohibited from discriminating against an individual on the basis of a disability.

105.   Plaintiff is a "person" under N.J.S.A. 10:5-1 (a).  Under the NJLAD, Rutgers, The State University of New Jersey is considered "a place of public accommodation," pursuant to N.J.S.A. 10:5-5 (1).

106.   Defendants violated Plaintiff's rights under NJLAD in failing to treat her equally with the other students in the University and in their study abroad program. Plaintiff is disabled and was, at all relevant times, otherwise qualified to be a student in the University and study abroad program as set forth herein. She was denied the benefits of the program or otherwise discriminated against because she was disabled. Plaintiff was, and continues to be, discriminated against, and has suffered due to a hostile learning environment, which was created by Defendants.

107.   Plaintiff sent an email complaining about the lack of accommodations and within a few days she was removed from the program without any due process as a result of her disabilities.

108.   Plaintiff has been the victim of retaliation, harassment, and intimidation by Defendants due to her disabilities, without any oversight by Defendants or the University, Board of Governors, Board of Trustees of Defendants.

109.   Plaintiff has been the victim and target of retaliation due to her disabilities and for exercising her right to notify Rutgers of her mistreatment and lack of accommodations by Defendants, individually and in their official capacities, in their study abroad program. Due to her disabilities, Plaintiff was denied her due process rights to see the alleged student complaint against her and by not being provided with notice, or a formal or informal hearing, or an appeal.

110.   Due to her disabilities, Defendants denied Plaintiff her rights to have investigations and proper hearings led and held by an official of the educational agency or institution who does not have a direct interest in the outcome of the investigation or hearing. Plaintiff has not been allowed to present evidence or to even see the accusations against her, which were allegedly relied upon to remove her from the University program.

111.   Defendants are liable for compensatory and punitive damages based on their participation and /or willful indifference and malice by administrators and

management and the egregiousness of the acts of discrimination against Plaintiff as set forth in detail herein.

112.   Defendant entities and administrators such as Associate Vice President Murphy are part of upper management throughout the relevant timeframe.

**113.**   The discriminatory actions and inactions by Defendants have caused harm to Plaintiff by preventing her from obtaining an education and participating in an educational study abroad program for her Spanish major.

## COUNT EIGHT

**(NEW JERSEY LAW AGAINST DISCRIMINATION- AIDING AND ABETTING)**

114.   Plaintiffs repeat, reallege, and incorporate each and every allegation and fact set forth above with the same force and effect as though they were fully set forth at length herein.

115.   Defendants, through their own conduct, actions and inactions, individually and in their official capacities aided and abetted each other in violation of N.J.S.A. 10:5-4 and 10:5-12(e).

116.   Individual Defendant had the tacit approval of Defendant entities and acted in concert with each other to violate Plaintiff's rights causing harm and damages to Plaintiff.

## COUNT NINE
**(NEW JERSEY LAW AGAINST DISCRIMINATION - HOSTILE LEARNING ENVIRONMENT)**

117.   Plaintiffs repeat, reallege, and incorporate each and every allegation and
fact set forth above with the same force and effect as though they were fully set
forth at length herein.

118.   Due to Plaintiff's physical and psychological disabilities, she is a member of
a protected class under the NJLAD.

119.   To assert a hostile school-environment claim under the New Jersey LAD, a
student must allege (1) "discriminatory conduct that would not have occurred 'but
for' the student's protected characteristic," (2) "that a reasonable student of the
same age, maturity level, and protected characteristic would consider sufficiently
severe or pervasive enough to create an intimidating, hostile, or offensive school
environment, and (3) "that the school district failed to reasonably address such
conduct." N.J.S.A. 10:5-5; See also L.W. ex rel L.G. v. Toms River Regional Sch.
Bd. of Educ., 915 A. 2d 535, 547 (N.J. 2007).

120.   No other student in the study abroad program was treated the way Plaintiff
was treated.

121.   Despite Plaintiff's numerous requests to obtain assistance from faculty, staff
and administrators at Rutgers, Defendant entities failed to reasonably address the
issues or to assist Plaintiff and instead created a hostile learning environment.

122.   Said Defendants were fully aware of Plaintiff's membership in a protected
class due to her physical and psychological disabilities. They discriminated against

32

Plaintiff due to her membership in that class and as a result, Defendants are liable for punitive damages for their harassment, intimidation, bullying, and retaliation creating a hostile learning environment for Plaintiff in violation of her rights and her 504 Plan.

## COUNT TEN
## (DEFENDANTS VIOLATED N.J.S.A. 59:1-1 et seq. - TORT CLAIMS ACT)

123.   Plaintiffs repeat, reallege, and incorporate each and every allegation and fact set forth above with the same force and effect as though they were fully set forth at length herein.

124.   Plaintiff alleges that Defendants' actions and inactions constituted negligence, gross negligence, deliberate indifference, and malice.

125.   "The primary liability imposed on public entities is that of *respondeat superior*: when the public employee is liable for acts within the scope of that employee's employment, so too is the entity." Tice v. Cramer, 133 N.J. 347, 355 (1993).

126.   "[C]laims for emotional distress are encompassed by the term "injury" in N.J.S.A. 59:9-2 (d)."  Ayers v. Jackson Tp., 106 N.J. 557, 575 (1987).

127.   "Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." Rappaport v. Nichols, 31 *N.J.* 188, 201 (1959); *see also*

Butler v. Acme Mkts., Inc., *89 N.J. 270 (1982)*; See <u>Kelly v. Gwinnell</u>, 96 N.J. 538, 543 (1984).

128.   All said individual defendants and said defendant entities, through their actions and inactions, individually and in their official capacities acting under color of law, were responsible and as a result of this breach of their duty of care, Plaintiff continues to be harassed, intimidated, retaliated against, defamed, and discriminated against and Plaintiff suffered and continues to suffer harm as a result.

129.   Defendant entities can be held liable for negligence in retaining an individual who demonstrates [s/]he is unfit for the job.   <u>See Lingar v. Live-In Companions, Inc</u>, 300 N.J. Super 22, 32 (1997) ("[a]n employer who negligently hires or retains in his employ an individual who is incompetent or unfit for the job 'may be liable to a third party whose injury was proximately caused by the employer's failure to exercise due care.'" (<u>quoting Kay,</u> 91 N.J. 159, 170 (1982)). The question in a negligent hiring claim is whether the "employer, knowing of its employee's unfitness, incompetence or dangerous attributes when it *hired or retained* its employee, should have reasonably foreseen the likelihood that the employee…would come into contact with members of the public…under circumstances that would create a risk of danger to such persons because of the employee's qualities." <u>See Kay,</u> 91 N.J. at 177 (emphasis added).

130.   Individual Defendants acting outside the scope of their employment can be held liable for acting with deliberate indifference and malice. Individual Defendants acted with deliberate indifference and malice toward Plaintiff causing her injury and damages in violation of her rights.

131.   Defendant entities, Rutgers, The State University of New Jersey John Does 1-100, each conducting their activities through their agents are subject to liability for harm resulting from the agents' negligence and gross negligence.

132.   Defendant entities each had a duty of care to Plaintiff and they breached that duty of care by their failure to properly train and/or supervise individual administrator Defendants such as but not limited to Associate Vice President Murphy.

133.   Defendant entities, knew or should have known of the actions and inactions of their employees and administrators and yet negligently hired and/or retained said employees and administrators knowing of the likelihood that they would and did cause harm to Plaintiffs.

134.   Associate Vice President Murphy wrongfully dismissed Plaintiff from her study abroad program based on her disability and in retaliation for her complaints thereby breaching his duty of care toward Plaintiff. Since Plaintiff complained to the professor, that professor also breached her duty of care in failing to address Plaintiff's needed accommodations such as note taking and failed to do so.

135.   Defendant entities each had a duty of care to Plaintiff and they breached that duty of care by their failure to properly train and/or supervise individual administrator Defendants such as but not limited to Associate Vice President Murphy.

136.   Defendant entities through its employees are liable for the actions of its employees acting individually and in their official capacities within the scope of their employment.

137.   Defendants Board of Governors and Board of Trustees are liable for the actions of Defendant employees acting within the scope of their employment.

138.   Said actions by individual Defendants directly and proximately caused harm and damages to Plaintiff.

139.   Through the negligence of Defendant entities in failing to properly train, supervise, and retain their employees, acting within their official capacities had a duty of care and breached that duty of care to Plaintiff directly and proximately causing injury to Plaintiff.

140.   Individual defendants acting individually and outside the scope of their employment under color of law, can be held liable to Plaintiff.

## COUNT ELEVEN
## (DEFAMATION- LIBEL AND SLANDER)

141.   Plaintiffs repeat, reallege, and incorporate each and every allegation and fact set forth above with the same force and effect as though they were fully set forth at length herein.

142.   A defamation claim "exists to achieve the proper balance between protecting reputation and protecting free speech." *Ward v. Zelikovsky,* 136 *N.J.*516, 528, 643 *A.*2d 972, 978 (1994). [T]he elements of a defamation claim are: (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher. *Restatement (Second) of Torts, supra,* § 558. When the plaintiff is a public official, plaintiff must establish that the defendant knowingly or with reckless disregard for the truth published false statements. *Id.* § 580A. Courts have referred to this standard as "actual malice." *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 279-80, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 706-07 (1964); *Lawrence v. Bauer Publ'g & Printing Ltd.,* 89 *N.J.* 451, 462, 446 *A.*2d 469, 475,*cert. denied* 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982); See DeAngelis v. Hill, 847 A. 2d 1261, 1267-1268 (N.J. Sup. Ct. 2004)

143.   Plaintiff meets the "effects test" and can show that (1) The defendant committed an *intentional tort;* (2) The plaintiff *felt the brunt of the harm in the forum* such that the forum can be said to be the focal point of the harm suffered by

37

the plaintiff as a result of that tort; (3) The defendant *expressly aimed his tortious conduct at the forum* such that the forum can be said to be the focal point of the tortious activity. <u>Remick v. Manfredy</u>, 238 F. 3d 248, 258 (Ct. App. 3rd Cir. 2001).

144.   In the present case, neither Plaintiff nor individually named Defendants are public officials.

145.   The professor and Associate Vice President Murphy falsely accused Plaintiff of trying to give Percoset to another student and claimed that said complaint came from another student. However, they then used that false complaint to retaliate against Plaintiff due to her complaints that she was not receiving her accommodations. Defendants' use of these false "facts" and misleading information about Plaintiff, knowing that it was false, were then made to a third party, and to the Registrar's and Financial Aid Offices, was negligent and defamatory.

146.   Publication of said knowingly false statements to various entities and offices within Rutgers such as but not limited to the financial aid office, on Plaintiff's school transcript and/or student records also constitutes defamation.

## COUNT TWELVE
### (FALSE LIGHT AND INVASION OF PRIVACY)

147.   Plaintiffs repeat, reallege, and incorporate each and every allegation and fact set forth above with the same force and effect as though they were fully set forth at length herein.

148.   Plaintiff was entitled not to have intrusion upon her seclusion, public disclosure of embarrassing private facts, and publicity, which placed her in a false light in the public eye. Romaine v. Kallinger, 109 N.J. 282, 293-294 (1988); Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 178 (3d Cir.2005).

149.   Said private information was not newsworthy but rather, only disclosed to the public by defendants acting under color of law, individually and in their official capacities to support their mistakes and intentional actions, to protect their program. Defendants disclosed Plaintiff's disabilities to third parties, targeted Plaintiff, and created an image of Plaintiff that was untrue.

## COUNT THIRTEEN
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

150.   Plaintiffs repeat, reallege, and incorporate each and every allegation and fact set forth above with the same force and effect as though they were fully set forth at length herein.

151.   A claim for intentional infliction of emotional distress requires three showings: (1) that the defendant's conduct was extreme and outrageous, (2) that the defendant's conduct caused the plaintiff severe emotional distress, and (3) that the defendant acted intending to cause the plaintiff such distress or with knowledge that such distress was substantially certain to occur. Brown v. Muhlenberg Twp., 269 F.3d 205, 218 (3d Cir.2001).

152.   For the reasons set forth herein, as well as those to be discovered during the course of discovery, Defendants, including individually named Defendants, conducted themselves in an extreme and outrageous manner causing severe emotional distress to Plaintiff and they knew that such harm would result from their actions.

153.   Defendants knew that Plaintiff was disabled and merely trying to get assistance with obtaining the accommodations she was entitled to under her 504 Plan. Yet, the Defendants did not like the fact that she complained about the study abroad program and the lack of accommodations and in turn, thee retaliated against her by making up false claims and terminating her program.

154.   As a direct and proximate result, Plaintiff suffered damages to her reputation, from Post-Traumatic Stress Disorder, and emotionally, economically, and educationally.

155.   Defendants intended to cause harm to Plaintiff in retaliation for her complaining about the study abroad program. Defendants were fully aware of the damage to Plaintiff that would be caused if she was dismissed from the program and therefore their actions were done with full knowledge of the consequences.

156.   Plaintiff's husband has also been affected by the actions and inactions by the Defendants in that he has suffered emotionally as well. He has also suffered financial harm due to the Defendants' breach of contract as well.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants on all of the foregoing Counts for loss of education, emotional distress, Post-Traumatic Stress Disorder, loss of opportunities, loss of future employment, loss of tuition, loss of financial aid, other economic damages, loss of reputation, loss of the study abroad program and experience, and seek reinstatement into the Rutgers undergraduate program so Plaintiff can complete her undergraduate degree, enforcement of the tuition contract, payment of the financial aid that is outstanding due to being wrongfully removed from the study abroad program, allow Plaintiff to complete another study abroad program for her major, enjoin Defendants from further discrimination against Plaintiff, and Plaintiffs also seek compensatory damages, consequential damages, punitive damages, expert fees, attorney's fees and costs, interest, costs of suit, and for such other relief as the Court deems equitable and just.

WARSHAW LAW FIRM, LLC
Attorneys for Plaintiffs

By: /s/ Julie Warshaw, Esq.
Julie Warshaw, Esq.

Dated: October 12, 2018

### TRIAL DESIGNATION

Pursuant to R. 4:25-4, Julie Warshaw, Esq. is hereby designated as trial attorney.

## CERTIFICATION PURSUANT TO RULE 4:5-1

I hereby certify that the matter in controversy is not the subject of any other action pending in any Court or of any pending arbitration proceeding, and that no other action nor arbitration proceeding is contemplated, and that I know of no other party who should be joined in this action.

WARSHAW LAW FIRM, LLC
Attorneys for Plaintiff

By: /s/ Julie Warshaw, Esq.
Julie Warshaw, Esq.

Dated: October 12, 2018

## CERTIFICATION PURSUANT TO RULE 1:38-7

I certify that confidential personal identifiers will be redacted from all documents submitted in the future in accordance with R.1:38-7(a).

WARSHAW LAW FIRM, LLC
Attorneys for Plaintiff

By: /s/ Julie Warshaw, Esq.
Julie Warshaw, Esq.

Dated: October 12, 2018